Craton LIDDELL, et al

v.

The BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, MISSOURI,
et al.

The BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, STATE OF
MISSOURI, Appellant,

v.

The STATE OF MISSOURI; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; The State of Missouri Board of Education and its members, Erwin A. Williamson (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M. Thompson, Donald W. Shelton and Robert Welling, Appellees.

The BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, STATE OF
MISSOURI, Appellee,

v.

The STATE OF MISSOURI; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; The State of Missouri Board of Education and its Members, Erwin A. Williamson (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M.

Thompson, Donald W. Shelton and Robert Welling, Appellants.

Nos. 85–2194, 85–2275.

United States Court of Appeals,
Eighth Circuit.

Nov. 6, 1986.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

HEANEY, Circuit Judge.

This matter comes before the Court on the State of Missouri's petition for rehearing. The State asserts that the opinion of this Court, *Liddell, et al v. State of Missouri, et al,* 801 F.2d 278 (8th Cir., 1986), misconstrues the issues raised on appeal. Specifically, it contends that the State does not have the responsibility to fund one-half of the general curriculum costs in the intra-district magnets in the City of St. Louis. *Id.* at 283. It also contends that the opinion extends the interdistrict student trans-

fer plan beyond the time limits contemplated by this Court's en banc opinion. *Id.* at 282.

We find no merit to the State's contention that the panel opinion extends the life of the interdistrict plan beyond that contemplated by the en banc opinion. We turn now to the more troublesome questions relating to the intra-district magnets.

In *Liddell v. Board of Education of City of St. Louis,* 491 F.Supp. 351, 357 (E.D. Mo.1980), Chief Judge James H. Meredith stated:

> The components of the Desegregation Plan are educationally sound and satisfy the requirements of the opinion, decree, and mandate of the Court of Appeals with regard to integrating the enrollment in the schools through the adoption of clustering in the elementary schools and by reassignment and transportation in the high schools. *Existing magnet schools will be continued and six new magnet schools added.* * * *
>
> * * * * * *
>
> * * * In the light of the financial position of the district, the nature of the violations committed by the parties, and all the appurtenant circumstances, *it is appropriate that the State be required to pay one-half of the total costs to implement the Desegregation Plan for the public schools of the City of St. Louis.* [Emphasis added.]

Thereafter, Judge Meredith's order was appealed to this Court, and we affirmed. *Liddell v. Board of Education of City of St. Louis,* 667 F.2d 643, 648 (8th Cir.1981) (Heaney, Bright, Stephenson). The effect of this affirmance was to require the State to pay one-half of the actual costs of establishing magnet schools. *Id.* at 654–55, 657.

Thereafter, Judge William L. Hungate, who had assumed responsibility for the case, ordered that *interdistrict* magnets be established in the city and the suburbs, and that the State be held responsible for paying *the full costs* of these interdistrict magnets. We affirmed. *Liddell v. Board of Education of City of St. Louis,* 677 F.2d

626, 628 (8th Cir.1982) (Heaney, Bright and Stephenson). We went on to say:

> Lest there be any misunderstanding, however, we make it clear that for budget Year Two (1981–1982) and succeeding budget years, the state is required to pay *one-half* of the *total actual costs* of implementing and operating the [intra-district] desegregation plan.

*Id.* at 631 (emphasis added & included).

Thereafter, the Court en banc, *Liddell v. State of Missouri,* 731 F.2d 1294, 1309–12 (8th Cir.1984), *cert. denied,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), discussed the magnet school issue at length. We noted that 8,000 students were enrolled in the intra-district magnet schools during the 1982–83 school year. We held that additional intra- and interdistrict magnets could be created as long as the total number of students enrolled in them did not exceed 20,000 with the new schools to be phased in over a four-year period. *Id.* at 1310–12 We held that the State could be required to pay the full capital and operating costs of the interdistrict magnets. *Id.* at 1311. We modified the panel opinion, however, and held that the State could not be required to pay for any magnet schools established in the suburbs. *Id.* at 1312.

The subject of magnet schools came before the Court again in *Liddell v. Board of Education of City of St. Louis,* 758 F.2d 290 (1985) (Heaney, Ross, McMillian). We stated:

> The parties agree that *the City Board and the State are to share equally in the capital and operating costs of magnet school programs* [intra-district magnets] established during or prior to the 1982–83 school year. * * *
>
> * * * * * *
>
> * * * *The physical condition of magnet schools existing during or prior to the 1982–83 school year must be [improved].* *It is the responsibility of the City Board and the State to share the costs of such capital improvements.*
>
> * * * * * *

This Court has already placed significant limits on the development of magnet schools which will hold costs at a reasonable level, including requirements:

\* \* \* \* \* \*

3. that new schools should be implemented in reasonably steady increments over a period of four years; and

4. that *there is a ceiling of 14,000 on the number of students to be enrolled in city magnets.*

As we said in *Liddell VII,* for the magnet schools to contribute to the desegregation process, they must have "individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment." *Liddell VII,* 731 F.2d at 1311. We emphasize that these requirements apply to *both the specialized and the general curriculum of the magnet schools.*

*Id.* at 298–99 (emphasis added).

On June 11, 1985, this Court denied the State's petition to rehear this panel decision en banc. We did, nonetheless, modify our opinion to make it clear that total enrollment in intradistrict magnets was not to exceed 8,000 students and was not to exceed 6,000 in interdistrict magnets. (Thus, we reduced the number of students permitted in magnets from 20,000 to 14,000, and by doing so, substantially reduced the State's liability.)

The question of funding for the magnet schools came before the Court again in 1986. The State's basic contention was that the St. Louis Board of Education was using the interdistrict magnets as a device to have the State pay 100% of the costs of educating large numbers of city students, and that only twelve percent of the white students enrolled in the interdistrict magnets were from the suburbs.

We recognized the merits of their argument and placed further limitations on the establishment of interdistrict magnets. *Liddell, et al v. State of Missouri, et al,* at 282–83. We stated:

3. Interdistrict magnets should not be approved unless there is a reasonable probability \* \* \* that at least forty percent of the white students will be residents of the suburbs (this is essentially the standard suggested by the State). \* \* The goal must be to have at least 2,000 more students in interdistrict magnets by the opening of the 1987–88 school year and a total of 6,000 students in these magnets by the 1989–90 school year. \* \*

4. Existing interdistrict magnets will be expected to meet the goal that forty percent of the white students be from the suburbs by the opening of the 1988–89 school year. New interdistrict magnets will be expected to meet the same goal by the beginning of each school's third year of operation. \* \* \*

(5) The State is obligated to fund 100 percent of the capital and operating costs of the interdistrict magnets. \* \* \* Moreover, these requirements are to apply to both the specialized and the generalized curriculum. *See Liddell VIII,* 758 F.2d at 299; *Liddell VII,* 731 F.2d at 1311.

We then discussed intra-district magnets. At *id.* 283–84, we stated:

It is the responsibility of the State to fund one-half of the operating and capital costs of the intradistrict magnets. *See, e.g., Liddell VIII,* 758 F.2d at 298, 303. Several disputes have arisen over the State's obligation in this regard. First, the Board contends that the State has an obligation to fund one-half of the total operating costs of these schools, including the specialized programs and the general curriculum. We agree with this contention. Magnet schools cannot be successful unless all programs at such schools are of the highest quality.

In a similar view, the Board contends that the pupil/teacher ratio in the general curriculum offered to the students at the magnet schools should be identical to that required for the nonintegrated schools. The state disagrees, taking the position that the pupil/teacher ratio for

the basic courses in the magnet schools should instead be that necessary to meet AAA standards. In this Court's en banc opinion, *Liddell VII*, we stated:

> Magnet schools under this plan will be distinguished by the features that have made them successful in other cities: individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment.

731 F.2d at 1311.

In *Liddell VIII*, we further emphasized that "these requirements apply to both the specialized and the general curriculum of the magnet schools." 758 F.2d at 299. This language seems clear, but we again state that beginning in the 1986–87 school year, the pupil/teacher ratios in the general curriculum in the magnet schools are to be the same as those in the nonintegrated schools at the comparable grade level.

In light of this history, it would appear that the State has an obligation to fund one-half of the total capital and operating costs of the intra-district magnets and that their responsibility extends beyond paying one-half of the specialized components of the intra-district magnets. However, the State asserts, and the City Board does not specifically dispute the assertion, that the district court has consistently construed our decision to limit the State's obligation with respect to intra-district magnets to those costs associated with establishing, maintaining, and operating only the specialized components of the intra-district magnets.

In light of the above circumstances, we believe that the district court should be permitted to reconsider the financing of intra-district magnets. On remand therefore, it shall reexamine the question of the State's responsibility with respect to financing the intra-district magnets in light of this Court's opinions, the construction that it has historically given to these opinions, and current circumstances. It shall then precisely determine the extent to which the State should share in the total capital and operating costs of the intra-district magnets. The important thing is, as we pointed out in our opinion, *id.* at 283–84, that the intra-district magnets have "individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment," and that the resources to accomplish these goals be made available.

Each party to this appeal shall bear its own costs.

### ORDER

The State of Missouri, et al, appellants' petition for rehearing en banc has been considered by the Court and is denied.